UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CANDICE A. HENRY,<br><br>　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>JO ANNE B. BARNHART, Commissioner of<br>Social Security,<br><br>　　　　　　　　Defendant. | Civil No.　04cv1892-WQH (CAB)<br><br>**REPORT AND RECOMMENDATION<br>TO DENY PLAINTIFF'S MOTION FOR<br>SUMMARY JUDGMENT AND GRANT<br>DEFENDANT'S MOTION FOR<br>SUMMARY JUDGMENT** |

## **I.  Introduction**

Plaintiff Candice A. Henry brings this action pursuant to 42 U.S.C. § 405(g)[1], to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") on her application for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act ("Act").  Plaintiff had been receiving SSI benefits, but on June 7, 2002, Plaintiff was determined to be no longer disabled, and Plaintiff has filed this action challenging that decision. Pursuant to Southern District of California Local Civil Rule 7.1(d)(1), the Court finds the parties' cross-motions for summary judgment can be decided on the papers and that no oral argument is

---

[1] 42 U.S.C. § 405(g) provides:

Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action ... brought in the district court of the United States. . . .  The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive.

necessary. After careful consideration of the papers, the administrative record, and the applicable law, this Court **RECOMMENDS** that the Commissioner's decision adopting the ALJ's decision be **AFFIRMED**, Plaintiff's motion for summary judgment be **DENIED**, and Defendant's cross-motion for summary judgment be **GRANTED**.

## II. Procedural History

In 1999, the Social Security Administration ("Administration") determined that Plaintiff was disabled, beginning on April 7, 1998, due to disorders of the back. (Administrative Record ("AR") at 45.) In June 2002, the Administration determined that Plaintiff's disability had ceased on June 1, 2002 and informed her benefits would terminate on August 1, 2002. (AR at 46, 50-53.) The Administration informed Plaintiff that, based on the medical evidence received in May 2002, she was able to do light work activity, and while she could not return to her past jobs as she described them, she could return to her past work as it is customarily performed in the national economy. (AR at 51.) Plaintiff requested reconsideration, and the Administration denied benefits again after reconsideration. (AR at 62-72.)

On January 8, 2003, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR at 93.) On June 3, 2003, the ALJ conducted a hearing to consider the merits of Plaintiff's application. (AR at 28-44.) As a result of this hearing, the ALJ issued a written decision dated October 22, 2003. (AR 19-27.) The ALJ found that Plaintiff's disability ceased on June 1, 2002, and she was no longer eligible for SSI benefits. (AR at 27.) Plaintiff disagreed with the ALJ's decision and requested an Appeals Council Review of the decision. (AR at 14-15.) On June 25, 2004, the Appeals Council concluded there was no basis for granting Plaintiff's request for review. (AR at 8-11.) Even though Plaintiff had submitted additional evidence after the administrative hearing, and the additional evidence was made a part of the record, the Appeals Council concluded the medical opinion submitted was not supported by any treatment or progress notes or records of any clinical or laboratory tests. (AR at 9.) The Appeals Council affirmed the ALJ's decision, which then became the final decision of the Commissioner. (AR at 8.)

On September 20, 2004, after having exhausted all administrative remedies, Plaintiff initiated this action challenging the proceedings in connection with the Commissioner adopting the ALJ's

decision. [Doc. No. 1.] Plaintiff filed a First Amended Complaint on November 7, 2005. [Doc. No. 13.] On January 5, 2006, the Commissioner filed an answer to the complaint. [Doc. No. 15.] On June 12, 2006, Plaintiff filed a motion for summary judgment, requesting that the Court reverse the ALJ's decision and remand for payment of benefits. [Doc. No. 22-23.] On July 7, 2006, Defendant filed a cross-motion for summary judgment, requesting that the ALJ's decision be affirmed. [Doc. No. 24-26.]

### III.  Factual Background

**A. Plaintiff's Testimony**

Plaintiff was born on September 4, 1956. (AR at 45.) She has a high school education and attended two years of college. (AR at 128.) She worked as a cashier at a gas station in 1988, did not work at all between 1988 and 1995 (AR at 33), and worked as a tech support specialist in customer relations between 1995 and 1998. (AR at 131.) At the administrative hearing on June 3, 2003, Plaintiff testified that she stopped working in April 1998 due to a motor vehicle accident, in which she injured her neck and back. (AR at 34.) In June 1999, she had fusion surgery. (*Id.*) Despite the surgery, however, Plaintiff indicated she still suffered pain in her arms, fingers, back and legs. (*Id.*) On a scale of one to ten, Plaintiff described her pain as a seven or eight. (AR at 35.) She indicated she was being treated at Neighborhood Healthcare, saw a chiropractor about once a week, and took Naprosyn. (AR at 35-36.)

Plaintiff believed that she could lift with both hands no more than a gallon of milk, equivalent to about five pounds. (AR at 36.) She stated that she had trouble using a mouse on a computer or holding a book. (AR at 37.) She reported she was only able to move a computer mouse for about 20 to 30 minutes before it became too painful, and she could sit comfortably for 15 minutes and stand comfortably for five minutes. (*Id.*) Plaintiff testified that she could walk approximately 350 steps before it became uncomfortable. (*Id.*) Additionally, she indicated that it took her about four to five hours to complete two loads of laundry. (*Id.*) She stated that she could maintain a task for about 20-30 minutes before needing to rest, lie down or use ice-packs in order to resume again. (AR at 38.) Plaintiff also stated that she had to lie down and rest for up to half an hour, about 6 times during the day. (AR at 39.)

Plaintiff testified that she had an 11-year-old son, who lived with her. (AR at 39.) She drove him to school and picked him up. (*Id.*) She also indicated that she did the chores around the house, including grocery shopping, cooking, laundry and cleaning. (*Id.*) Plaintiff indicated, however, that she was embarrassed at the state of her home, because she was not able to maintain it the way she would have liked. (AR at 40.) She indicated she was not seeing a mental health professional and not taking any medication for depression. (AR at 39.)

**B. Medical Evidence Presented**

**1. Before September 1999**

Beginning in July 1998, Plaintiff saw Steven Horowitz, D.O., for treatment of discomfort in her neck, right arm, right leg, and lower back and for intermittent headaches resulting from a car accident in April 1998. (AR at 198-226.) An MRI of Plaintiff's cervical spine revealed disc protrusion and bulge at C5-6 and L4-5. (AR at 198, 239-40.) On June 16, 1999, Plaintiff had anterior cervical discectomy and fusion surgery. (AR at 255.) X-rays taken on August 17, 1999 showed that the graft was in good position, with no evidence of migration, and fusion appeared to be consolidating well. (AR at 284.) At that time, Plaintiff's strength was good in the upper extremities including hand grip, wrist extension, wrist flexion, biceps and triceps. (*Id.*) Plaintiff noted improvement in left cervical radicular pains that she had been experiencing and a return of feeling in her thumb and first finger. She also indicated that she continued to have some mild neck pain, and her doctor recommended she wear a hard collar for three months. (*Id.*)

**2. Chuck Grauerholtz, R.P.T.**

Plaintiff began receiving physical therapy on November 1, 1999, after her fusion surgery. (AR at 345-46.) She reported moderate pain, sometimes as low as 2-3/10, but frequently reaching 8/10. (AR at 345.) Even though the surgery was four and a half months earlier, the physical therapist noted that Plaintiff was fearful of performing exercises of her cervical spine, and as a result, she reported decreased functional use of her bilateral shoulders and ability to perform any sustained activity. (*Id.*) The physical therapist also noted that Plaintiff was right-handed and had an unusual Bell Curve for grip strength, suggesting possible malingering. (*Id.*) The treatment plan involved two more physical therapy sessions, as allowed by Plaintiff's insurance, and a reevaluation from there.

1  (*Id.*) There is no evidence in the record to suggest treatment went beyond the two sessions.

### 3. Robert J. Santella, M.D.

Dr. Santella was a gynecologist and primary care physician, and it appears from the record that he treated Plaintiff as early as January 1999. (AR at 347-58.) She saw Dr. Santella during August 2000 for problems with abnormal menstrual bleeding. (AR at 327-32.) On August 9, 2000, Plaintiff had a normal pelvic ultrasound. (AR at 328.)

### 4. Centro Medico Latino Clinic

The record contains notes from several visits Plaintiff made to the clinic in September 2001. (AR at 318-24.) The notes from the clinic indicate that Plaintiff had a tobacco addiction, a hypothyroid condition and high cholesterol. On September 28, 2001, Plaintiff reported chronic neck pain and reported that she saw a chiropractor, which helped a lot. (AR at 324.)

### 5. Marvan N. Sabbagh, M.D.

In May 2002, Plaintiff was referred to Dr. Sabbagh, a neurologist, for her neck pain. (AR at 337-38.) Three weeks before, Plaintiff had fallen and complained of severe pain in her left pectoral region. (AR at 337.) She reported to the doctor that she was taking Levoxyl, Arthrotec and Excedrin. (*Id.*) A motor examination revealed normal tone and no atrophy. Her motor strength was 5/5 in most extremities. (AR at 338.) She had decreased sensation to pin prick and hypoesthesia to light touch in the right C-8 dermatomal distribution and left L-5 dermotomal distribution. (*Id.*.) Her gait was normal, and the doctor diagnosed her with back pain, neck pain, polyradiculopathy involving the cervical and lumbosacral region. (*Id.*)

### 6. Neighborhood Healthcare

Plaintiff testified at the administrative hearing that Neighborhood Healthcare was her treating source. (AR at 35.) The record contains progress notes of visits Plaintiff made to Neighborhood Healthcare between September 2002 and May 2003. (AR at 404-05, 411-23.) During this time, she occasionally complained of neck and/or back pain, but she was also being treated for her thyroid condition.

### 7. Rajeswari Kumar, M.D.

At the request of the Department of Social Services, Plaintiff underwent an orthopaedic

consultation with Dr. Kumar on April 28, 2002. (AR at 359-64.) At the examination, Plaintiff reported to Dr. Kumar that while the fusion surgery improved her numbness in the right hand, the pain in the neck and lower back persisted. (AR at 359.) She informed the doctor that she had been diagnosed with arthritis in the neck and was receiving chiropractic treatment as needed. (*Id.*) Plaintiff reported that her neck pain was constant and radiated down to the right shoulder. (*Id.*) Plaintiff also said that her lower back pain was constant, and there was occasional numbness in the right medial two fingers. (*Id.*) She described her pain as sharp and burning and aggravated with 20 minutes of standing, 30 minutes of walking, bending or lifting. (AR at 360.) She reported that she took Excedrin four or five times a day and thyroid medication. (*Id.*)

On physical examination, Plaintiff's gait was normal with a normal ability to toe-and-heel walk. She also had normal swing and stance phases. (AR at 361.) There were no spasms or tenderness in her paravertebral musculature and her spine contour was normal, but she had restricted motion in her cervical spine and minimally restricted motion in her lumbar spine. (AR at 361, 363-64.) Plaintiff's upper and lower extremity examinations did not reveal joint pathology, and she had normal ranges of motion in her shoulders, elbows, wrists, hands, ankles, knees and hips, with no tenderness. (AR at 361-62.) Her neurological examination was normal, except for reduced sensation in the lateral aspect of her calves. (AR at 363.) Dr. Kumar concluded that because of Plaintiff's previous cervical spine surgery and limited ranges of motion in her spine, she was limited to pushing, pulling and lifting 20 pounds occasionally and 10 pounds frequently; standing and walking six hours; and unlimited sitting. (AR at 364.)

### 8. Mounir Soliman, M.D.

At the request of the Department of Social Services, Plaintiff underwent a psychiatric evaluation with Dr. Soliman on May 6, 2002. (AR at 367-70.) Dr. Soliman indicated that Plaintiff drove herself to the evaluation. (AR at 367.) He observed that her gait and posture were normal, and he noted no involuntary movements on Plaintiff's part. (*Id.*) He noted her chief complaint was physical pain. (*Id.*) Plaintiff informed the doctor that she had been suffering from multiple physical problems since 1998 and had not been able to work since. (*Id.*) She reported chronic pain, weakness in her back, neck, arms and legs. (*Id.*) She denied any psychiatric condition, including mood

symptoms, psychotic symptoms, or any alcohol or drug problems. (AR at 367-68.) She indicated she was currently under no psychiatric treatment, and she related her current disability to her physical condition. (AR at 368.) She indicated she was able to cook, clean, shop, do errands, take care of personal hygiene and take care of financial responsibilities. (*Id.*) She also reported that she knew how to drive a car. (*Id.*) She did, however, report that she was unable to concentrate on her daily activities due to her physical pain. (AR at 369.)

Dr. Soliman concluded that Plaintiff had no psychiatric diagnosis, and she had a global assessment functioning of 75. (AR at 369-70.) From a psychiatric standpoint, the doctor believed Plaintiff was able to understand, carry out, and remember simple and complex instructions. (AR at 370.) She could interact with co-workers, supervisors and the general public. (*Id.*) He believed she was able to withstand the stress and pressures associated with an eight-hour workday and day-to-day activities. (*Id.*) Dr. Soliman concluded there was no evidence to indicate any limitation of Plaintiff's work ability based on her current psychiatric condition. (*Id.*)

### 9. Other Medical Evidence Presented

An MRI of the cervical spine taken on May 27, 2000 showed status post discectomy and fusion at C5-6, with no significant focal disc herniations. (AR at 333.) An MRI of the lumbar spine revealed degenerative disc disease at L4-5, with no focal disc protrusions, and facet arthropathy in the lower lumbar spine. (AR at 334.)

A cervical spine x-ray taken September 21, 2001 revealed straightening of the cervical spine, degenerative disc disease and anterior ligamentous ossification. (AR at 316.) An x-ray of the thoracic spine showed early anterior osteophyte formation and normal soft tissues. (AR at 317.) Both x-rays showed normal mineralizations without evidence of fracture or sublugation, and no arthritic changes.

### 10. Physical Residual Functional Capacity Assessment

On June 5, 2002, Don Jenkins, M.D., reviewed the medical records and conducted a Physical Residual Functional Capacity Assessment of Plaintiff. (AR at 372-80.) The doctor concluded that Plaintiff could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of six hours in an eight-hour workday; and sit

(with normal breaks) for a total of six hours in an eight-hour workday. (AR at 373.) Dr. Jenkins believed Plaintiff had unlimited ability to push and/or pull. (*Id.*) As far as postural limitations were concerned, Dr. Jenkins believed Plaintiff could frequently climb, balance, stoop, kneel, crouch and crawl. (AR at 374.) The doctor also concluded that Plaintiff had no manipulative, visual, communicative, or environmental limitations. (AR at 375-76.) Dr. Jenkins believed Plaintiff had improved from her surgery, and she could do light work. (AR at 380.)

**11. Roy C. Springer, M.D.**

On February 13, 2004, after the ALJ issued his determination that Plaintiff was no longer disabled, Plaintiff submitted a Physical Capacities assessment from Dr. Springer. (AR at 427-29.) Dr. Springer concluded that, due to Plaintiff's chronic pain, she could stand/walk no more than two hours in an eight-hour work day, and sit no more than two hours in an eight-hour workday. (AR at 427.) He believed she was restricted in using her hands and fingers for repetitive motions, because she was unable to operate a mouse. (*Id.*) He also believed Plaintiff could never carry 15 pounds and could constantly carry 10 pounds. (AR at 428.) Due to Plaintiff's chronic soft tissue disease, Dr. Springer believed Plaintiff could occasionally climb, balance, kneel, and crouch; could never stoop or crawl; could constantly reach from waist to chest; could frequently reach below the knees, from waist to knees, and from chest to shoulders; but could never reach above the shoulders. (*Id.*)

**C. Vocational Evidence Presented**

Gloria Lassoff testified at the administrative hearing as a vocational expert. (AR at 42-44.) Based on Plaintiff's description of her past work, as a tech support specialist and a cashier, Ms. Lassoff prepared a profile of Plaintiff's prior work based on the Dictionary of Occupational Titles. (AR at 33, 186-87.) The profile classified Plaintiff's prior work as that of a "salesperson, pts." (AR at 186.) The ALJ presented three hypotheticals encompassing various aspects of Plaintiff's physical and mental limitations.

The first hypothetical assumed the following facts and limitations: a younger individual with 14 years of education, past work as a parts salesperson, who could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk for a total of six hours in an eight-hour workday, sit for six hours in an eight-hour workday, conduct unlimited pushing or pulling, and

frequently climb, balance, stoop, kneel, crouch and crawl, with no medically determinable mental impairment. (AR at 42, 373-74, 388.) Ms. Lassoff found that, given those limitations, Plaintiff would be able to do her former work. (AR at 42.)

The second hypothetical assumed the same age, education, and work experience as in the previous hypothetical but incorporated the limitations from Dr. Kumar's report that Plaintiff had the ability to do light work and incorporated the psychiatric consultative exam that indicated Plaintiff had no psychiatric diagnosis. (AR at 42.) With those limitations, Ms. Lassof determined that Plaintiff could do her former work.

The third hypothetical again assumed the same age, education, and work experience but incorporated the limitations Plaintiff laid out for herself: could lift five pounds with both hands, difficulty gripping and grasping with the right upper extremity, could sit comfortably for 15 minutes, stand for five minutes, comfortably walk for 350 steps, maintain laundry and cleaning for 20-30 minutes, and must rest about six times a day up to half an hour at a time. (AR at 42-43.) With those limitations, Ms. Lassoff determined that Plaintiff would not be able to sustain her former work or any other work. (AR at 44.)

**D. Other Evidence Presented**

Verna Hansen, Plaintiff's friend, testified that she saw Plaintiff go from a "productive young woman" to "practically nothing because of the pain." (AR at 41.) She indicated she saw Plaintiff about once a week, and she believed Plaintiff wanted nothing more than to work but had not been able to do so. (*Id.*)

**E. ALJ's Findings**

After a discussion of the evidence in the record, the ALJ determined that Plaintiff was no longer under a disability as of June 1, 2002. (AR at 26.) The ALJ concluded that Plaintiff retained the residual functional capacity to perform her past relevant work as a parts salesperson. (*Id.*) In making this determination, he considered the State Agency consultative physicians' opinions and gave them significant weight, because they were consistent with the medical record as a whole. (AR at 24.) The ALJ considered Verna Hansen's testimony, but rejected her opinion regarding Plaintiff's disability because, because she did not have any medical training, and her testimony was inconsistent

with the physicians' records. (AR at 25-26.)

The ALJ found that Plaintiff's allegations of disabling limitations were not credible to the extent alleged. (AR at 24.) He provide 13 reasons for this conclusion, including: 1) Plaintiff was only taking over-the-counter medication and not the type of pain medication associated with severe disabling pain; 2) Plaintiff was not currently being treated by a physician for her alleged neck and back pain and only saw a chiropractor; 3) Plaintiff's treating records from June and September 2002 show that Plaintiff did not complain of back or neck pain, even though she testified that she had severe pain daily; the ALJ noted that Plaintiff did not show complaints of back and neck pain until benefits had ceased; and 4) there was no opinion of disability from a treating physician. (AR at 25.)

Specifically, the ALJ found that Plaintiff suffered from a severe neck impairment-status post cervical fusion, back impairment and no mental impairment. (AR at 22.) Although her impairments were severe, they did not meet or equal an impairment or combination of impairments listed in the regulations. (*Id.*) Then, the ALJ determined Plaintiff had experienced medical improvement related to her ability to work. (AR at 26.) The ALJ found that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; sit, stand and walk for six hours in an eight-hour day; frequently climb, balance, stoop, kneel, crouch and crawl; and had no mental limitations. (AR at 24.) The ALJ then found Plaintiff could perform her past relevant work as a parts salesperson. (AR at 26.) Therefore, he concluded, she was no longer under a disability as defined under the Act. (AR at 22.)

## IV. Discussion

**A. Legal Standard**

The Social Security Act authorizes payment of SSI benefits to individuals who have an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). The disabling impairment must be so severe that the claimant is not only unable to do her previous work, but, considering age, education, and work experience, cannot engage in any kind of substantial gainful work that exists in the national economy. § 1382c(a)(3)(B).

### 1. Initial Five-Step Process

The Commissioner makes this assessment by a five-step analysis. First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 416.920(b). Second, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." If not, the claimant is not disabled. § 416.920(c). Third, the medical evidence of the claimant's impairment is compared to a list of impairments that are presumed severe enough to preclude work; if the claimant's impairment meets or equals one of the listed impairments, benefits are awarded. § 416.920(d). If not, the Commissioner proceeds to the next step. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987). Fourth, if the claimant can do her past work, benefits are denied. 20 C.F.R. § 416.920(e). If the claimant cannot perform her past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work. § 416.920(f). If the Commissioner meets this burden and proves that the claimant is able to perform other work that exists in the national economy, then benefits are denied. § 416.966.

Sections 405(g) and 421(d) of the Social Security Act allow unsuccessful applicants to seek judicial review of a final agency decision of the Commissioner. 42 U.S.C. §§ 405(g), 421(d). The scope of judicial review is limited, however, and the Commissioner's denial of benefits "will be disturbed only if it is not supported by substantial evidence or is based on legal error." *Brawner v. Sec'y of Health and Human Servs.*, 839 F.2d 432, 433 (9th Cir. 1988) (citing *Green v. Heckler*, 803 F.2d 528, 529 (9th Cir. 1986)). Substantial evidence means "more than a mere scintilla" but less than a preponderance. *Sandqathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997). "[I]t is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). The court must consider the record as a whole, weighing both the evidence that supports and detracts from the Commissioner's conclusions. *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988). If the evidence supports more than one rational interpretation, the court must uphold the ALJ's decision. *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). When the evidence is inconclusive, "questions of credibility and resolution of conflicts in the testimony are functions solely of the Secretary." *Sample*

*v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).

Even if the reviewing court finds that substantial evidence supports the ALJ's conclusions, the court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching his or her decision. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978). Section 405(g) permits a court to enter a judgment affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C. § 405(g). The reviewing court may also remand the matter to the Commissioner for further proceedings. *Id.*

The ALJ has a special duty in social security cases to fully and fairly develop the record in order to make an informed decision on a claimant's entitlement to disability benefits. *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991). Because disability hearings are not adversarial in nature, the ALJ must "inform himself about the facts relevant to his decision," even if the claimant is represented by counsel. *Id.* (quoting *Heckler v. Campbell*, 461 U.S. 458, 471 n.1 (1983)).

**2. Medical Improvement and Seven Step Re-Evaluation**

Once a claimant is found disabled, a presumption of continuing disability arises. *See Bellamy v. Sec'y of Health & Human Servs.*, 755 F.2d 1380, 1381 (9th Cir. 1985). Although the claimant retains the burden of proof, this presumption shifts the burden of production to the Commissioner to produce evidence to meet or rebut this presumption. *Id.*

Disability benefits cannot be terminated unless substantial evidence demonstrates medical improvement in the claimant's impairment so that the claimant is able to engage in substantial gainful activity. *See* 42 U.S.C. § 423(f); *Murray v. Heckler*, 722 F.2d 499, 500 (9th Cir. 1983). Medical improvement is defined as any decrease in the medical severity of the impairment that was present at the time of the most recent medical decision favorable to the claimant, *i.e.*, the most recent decision that the claimant was disabled or continued to be disabled. *See* 20 C.F.R. §§ 416.994(b)(1)(i) & (b)(2)(i).

In determining whether to discontinue disability benefits, the Commissioner applies a seven-step sequential evaluation. First, if the claimant has an impairment or combination of impairments that meets or equals a listing, disability continues. Second, if the claimant does not meet or equal a listing, the ALJ will determine whether medical improvement has occurred. Third, if medical

improvement has occurred, the ALJ will determine whether the improvement is related to ability to work (*i.e.*, to residual functional capacity ("RFC")).  Fourth, if no medical improvement--or no improvement related to ability to work--has occurred, disability continues.  Fifth, if there has been medical improvement related to ability to work, the ALJ will determine whether all the current impairments, in combination, are "severe," and, if not, disability ends.  Sixth, if the claimant meets the "severity" criteria, the ALJ will determine the current RFC, and, if the claimant is able to do past work, disability ends.  Finally, if the claimant remains unable to do past work, the ALJ will determine whether the claimant can do other work.  *See* 20 C.F.R. § 416.994(b)(5).

**B. Plaintiff's Claim**

Plaintiff argues several grounds for reversal of the ALJ's decision: 1) the ALJ failed in his duty to fully develop the record even though Plaintiff was unrepresented by counsel at the administrative hearing; 2) the Appeals Council failed to remand the claim to the ALJ to consider the new evidence from Dr. Springer; and 3) the ALJ failed to evaluate Plaintiff's ability to perform all of the duties of her past work.  The Court considers each of these arguments below.

**1.  ALJ did not fail to develop the record**

Plaintiff appeared at the administrative hearing without counsel.  (AR at 31.)  She now argues it is unclear whether she willingly waived her right to counsel.  In addition, she argues that because she appeared at the administrative hearing without counsel, the ALJ had a heightened duty to develop the record, and the ALJ erred by not doing so.

Lack of counsel does not in itself affect the validity of the hearing.  *Hall v. Secretary*, 602 F.2d 1372, 1378 (9th Cir. 1979).  When a claimant appears at a hearing without counsel, the ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.  He must be especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Cox v. Califano*, 587 F.2d 988, 991 (9th Cir. 1978) (citations and internal quotations omitted).  A claimant seeking relief by way of remand must demonstrate that the absence of counsel resulted in prejudice or unfairness during the hearing.  *Hall*, 602 F.2d at 1378.

In the instant case, when Plaintiff appeared at the administrative hearing without counsel, the ALJ advised her of her right to be represented.  (AR at 31.)  Plaintiff indicated she had been trying

for three months to find an attorney but was unsuccessful. (*Id.*) While the ALJ did note that Plaintiff already had three months, which he believed to be a long time, he also did give her an opportunity to postpone the hearing so she could have more time to seek counsel. (*Id.*) At that point, Plaintiff clearly indicated she wanted to go forward with the hearing. (*Id.*) During the hearing, the ALJ gave Plaintiff an opportunity to present her case and to add documents to the record if she wanted. (*Id.*) After Plaintiff gave her testimony, the ALJ asked her if she had anything else to tell him. (AR at 40.) The ALJ also gave Plaintiff's friend, who accompanied her to the hearing, an opportunity to discuss Plaintiff's condition. (AR at 41.) At the end of Ms. Hansen's testimony, the ALJ again asked whether she had anything else to add, and Ms. Hanesen indicated she did not. (*Id.*) Plaintiff has not presented any evidence that indicates absence of counsel resulted in prejudice or unfairness during the hearing.

It is true that the ALJ has a special duty in social security cases to fully and fairly develop the record in order to make an informed decision on a claimant's entitlement to disability benefits. *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991). There is no evidence to indicate the ALJ did not fully and fairly develop the record in this case. Plaintiff's citation to *Vidal v. Harris*, 637 F.2d 710 (9th cir. 1981) is inapplicable here. In *Vidal*, the court found that the ALJ's conclusion was not supported by substantial evidence and that the ALJ's examination of the vocational expert was inadequate. As a result, that court found the ALJ had not met his burden of fully and fairly developing the record. In this case, however, there is substantial evidence to support the ALJ's conclusion, as discussed below. Further, there was no "ambiguous evidence" which would have triggered the ALJ's duty to develop the record further. *See Tonapetyan v. Halter*, 242 F.3d 1144 (9th Cir. 2001).

**2. The Appeals Council properly rejected Dr. Springer's opinion**

Plaintiff also argues that the Appeals Council should have remanded her claim to the ALJ to consider new medical evidence from her treating physician, Dr. Springer, submitted after the ALJ issued his opinion. Specifically, Plaintiff argues that the Appeals Council failed to articulate specific and legitimate reasons for rejecting Dr. Springer's opinion and did not give proper weight to the opinion.

When physicians' medical opinions are offered as evidence, the Ninth Circuit distinguishes among three types of physicians and gives varying weight to their opinions. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The three types of physicians are the following: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians). *Id.* The opinion of a treating physician receives greater weight than that of a non-treating physician, because the treating physician "is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) (citation omitted). Likewise, greater weight is accorded to the opinion of an examining physician than a non-examining physician. *Id.*

An acceptable treating source is one who has provided the claimant with medical treatment or evaluation and either has, or has had, an ongoing treatment relationship with the plaintiff. 20 C.F.R. § 416.902. If the frequency and nature of treatment or evaluation by an acceptable medical source is typical for the plaintiff's condition, the court will consider that relationship to be an ongoing treatment relationship. *Benton v. Barnhart*, 331 F.3d 1030, 1034 (9th Cir. 2003). However, the Ninth Circuit does not consider a medical source to be a treating source "if [the] relationship with the source is not based on medical need for treatment or evaluation, but solely to obtain a report in support of [a] claim for disability." *Id.* In such case, the acceptable medical source is considered a nontreating source. *Id.* Additionally, when a plaintiff provides new medical evidence from a treating doctor, but it is obtained after the Commissioner's denial of benefits, the Ninth Circuit has held that the Appeals Council shall give it less weight in determining whether the ALJ's decision is contradicted by the weight of the evidence in the record. *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996) (citations omitted).

Here, the Appeals Council rejected Dr. Springer's opinion, because it was not supported by any treatment or progress notes or records of any clinical or laboratory tests. (AR at 9.) The only opinion Dr. Springer provided was by filling out a four-page Physical Capacities form. Assuming Dr. Springer was a treating physician, the fact that his opinion is conclusory in nature, brief and unsupported by clinical findings are valid reasons to reject an opinion of a treating physician.

*Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992). However, there is no evidence in the record to indicate that Dr. Springer was Plaintiff's treating physician.

At no time did Plaintiff submit progress notes or treatment records from Dr. Springer and at no time during the administrative hearing did Plaintiff indicate that Dr. Springer was one of her treating physicians. Therefore, the Appeals Council had no reason to give Dr. Springer's opinion the weight of a treating physician. *See Benton v. Barnhart*, 331 F.3d 1030, 1038 (9th Cir. 2003.) Finally, the probative value of Dr. Springer's opinion is diminished by the fact that it was submitted after the ALJ issued his opinion and determined Plaintiff was no longer eligible for SSI benefits. *See Macri*, 93 F.3d at 544. As such, the Appeals Council was not required to remand the case to the ALJ for consideration of the new medical evidence submitted by Dr. Springer.

**3. ALJ properly found Plaintiff could return to her past relevant work**

Plaintiff finally argues that the ALJ improperly evaluated whether she could return to her past relevant work. Specifically, Plaintiff argues her past work was as a "tech support specialist in customer service," but the vocational expert classified the work as "parts salesperson." In addition, Plaintiff argues that her past work as a tech support specialist required medium work activity, but the vocational expert indicated the work as a parts salesperson was classified as light work activity.

To determine whether plaintiff has the residual functional capacity to perform her past relevant work, the ALJ in step four (or step six of the re-evaluation analysis) must evaluate the work demands of the past relevant work and compare them to her present capacity. *Villa v. Heckler*, 797 F.2d 794, 797-98 (9th Cir. 1986). Plaintiff's past relevant work is considered not only as she actually performed it, but as it is ordinarily performed in the national economy. SSR 82-61. Although not required to do so, the ALJ in this case enlisted the services of a vocational expert to assist in evaluating Plaintiff's ability to perform her past work. The vocational expert, Ms. Lassoff, heard Plaintiff's testimony and prepared a profile of Plaintiff's prior work based on the Dictionary of Occupational Titles ("DOT"). (AR at 33.) While Ms. Lassoff did indicate that the job title was different from what Plaintiff called it, there is no evidence to indicate that Ms. Lassoff's assessment was incorrect or that the job title of "parts salesperson" was not a job that had similar demands and requirements as that of Plaintiff's past relevant work.

At this point in the analysis, the burden rests with the plaintiff, and she must establish her inability to return to her former type of work and not just to her particular former job. *Villa*, 797 F.2d at 798. Plaintiff meets this burden and overcomes the presumption created by use of the DOT if she can demonstrate that the duties in her particular work as actually performed were not contemplated by the drafters of the DOT. *Id.* Plaintiff can also satisfy the burden by demonstrating that the same type of work as performed in the national economy actually involves demands higher than the DOT suggests. *Id.* at 799. Alternatively, plaintiff may challenge the ALJ's classification of her past relevant work according to the DOT; if the ALJ incorrectly categorized it, the job description becomes irrelevant. *Id.* at 798.

Here, the ALJ properly developed the record by asking Plaintiff what her previous work as a "tech support specialist" entailed. (AR at 32.) She responded that she worked in the Sears Repair Center where she helped set up appointments on the phone, helped the technicians with the parts, ordered the parts, and got the parts for the customers and technicians. (AR at 32-33.) Based on this testimony, the vocational expert evaluated the demands of Plaintiff's past relevant work and prepared a profile of her prior work based on the DOT. (AR at 33, 186.) The ALJ concluded that Plaintiff was capable of performing the full range of light work, and the exertional requirements of her past work indicated she could return to her past relevant work. Plaintiff fails to overcome the presumption created by use of the DOT. The standard is whether Plaintiff can return to the same type of work, not the exact same job she was performing previously. While she challenges the vocational expert's classification of her past relevant work as "parts salesperson," she does not provide an alternative classification that would more closely meet the demands of her past relevant work.

Even if the ALJ committed error at step four (or step six in the re-evaluation analysis), there is substantial evidence to support his determination that Plaintiff could perform the full range of light work. As such, if the ALJ had to proceed to the next step in the analysis, an individual of Plaintiff's age who can perform light work is not disabled at step five of the sequential analysis (or step seven of the re-evaluation analysis). 20 C.F.R. Part 404, Subpart P, Appendix 2, 202.00 ("The functional capacity to perform a full range of light work includes the functional capacity to perform sedentary []

work. Approximately 1,600 separate sedentary and light unskilled occupations can be identified in eight broad occupational categories, each occupation representing numerous jobs in the national economy."). Given that other reliable evidence exists to support the ALJ's decision, even if the ALJ committed error in determining Plaintiff could return to her past relevant work, it was harmless error. *Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993).

**4. ALJ's opinion is supported by substantial evidence and is not based on legal error**

Despite Plaintiff's claims of debilitating pain, her own testimony revealed she had not sought treatment for the pain, other than visits to the chiropractor and taking Naprosyn.[2] (AR at 35-36.) Even though chiropractic care was the main source of pain relief, the chiropractic office she visited had no treatment records to submit for the disability review. (AR at 406-08.) The treatment notes from Neighborhood Healthcare indicate that Plaintiff did complain about pain in her neck and back, but that she also visited the clinic for other unrelated ailments. (AR at 404-05, 411-23.)

Plaintiff was receiving SSI benefits, because the Administration found she was unable to work due to the injuries she suffered in a car accident and the subsequent fusion surgery. X-rays taken after the surgery revealed Plaintiff was healing well. (AR at 284.) An MRI taken in 2000 and x-rays taken in 2001 indicated no disc herniations or protrusions, a major improvement from the MRI taken in 1998. (AR at 198, 239-40, 316-17, 333-34.) The record lacks objective evidence to support the existence of and treatment for the debilitating pain Plaintiff currently alleges. In addition, Dr. Kumar and Dr. Jenkins's reports support the ALJ's conclusion that Plaintiff was capable of performing light work. As such, there was substantial evidence in the record to support the ALJ's decision.

Finally, because this is a case of disability cessation, the ALJ effectively met the burden of production to rebut the presumption of Plaintiff's continuing disability. *Bellamy*, 755 F.2d at 1381. The reports of Dr. Kumar, Dr. Jenkins and Dr. Solimar support the conclusion that Plaintiff's condition had improved since the last favorable disability decision, in which she was found to have discogenic and degenerative disorders of the back. Further, the MRI taken in 2000 and x-ray taken

---

[2] Naprosyn appears to be a drug used for the management of mild to moderate pain, fever, and inflammation. http://www.medicinenet.com/naproxen/article.htm.

1 in 2001 of Plaintiff's back support the conclusion that Plaintiff's back condition had improved. The
2 ALJ properly weighed the evidence, performed the seven-step re-evaluation analysis, and found
3 Plaintiff could return to her past work.

### V.  Conclusion

After a thorough review of the record and the papers submitted and based on the reasons set forth above, this Court finds the ALJ's decision that Plaintiff could return to her previous relevant work was supported by substantial evidence in the record and was not based on legal error. Accordingly, this Court **RECOMMENDS** Plaintiff's motion for reversal be **DENIED** and the Commissioner's cross-motion for summary judgment be **GRANTED**.

This Report and Recommendation is submitted to the United States District Judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1).  Any party may file written objections with the Court and serve a copy on all parties on or before **March 5, 2007**.  The document should be captioned "Objections to Report and Recommendation."  Any reply to the objections shall be filed and served **no later than 10 days after being served with the Objections**.

**IT IS SO ORDERED.**

DATED:  February 16, 2007

_____
**CATHY ANN BENCIVENGO**
United States Magistrate Judge